**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **WEBCOR CONSTRUCTION, LP**, *ET AL* <br><br> Plaintiffs, <br><br> v. <br><br> **ZURICH AMERICAN INSURANCE COMPANY**, *ET AL.* <br><br> Defendants. <br> ---------------------------------------------------- <br> *And Third Party Complaint* <br><br> **OLD REPUBLIC GENERAL INSURANCE CORP.,** <br><br> Third Party Plaintiff, <br> v. <br><br> **MOTORISTS MUTUAL INS. CO.,** <br><br> Third Party Defendant. | Case No.: 17-cv-2220 YGR <br><br> **ORDER GRANTING MOTORISTS' MOTION FOR SUMMARY JUDGMENT; DENYING OLD REPUBLIC'S MOTION FOR SUMMARY JUDGMENT** <br><br> **Dkt. Nos. 211, 212** |

Presently pending before the Court are cross motions for summary judgment by third-party plaintiff Old Republic General Insurance Corporation ("Old Republic") and third-party defendant Motorists Mutual Insurance Company ("Motorists") regarding the latter's duty to defend in an underlying construction case. (Dkt. Nos. 211 and 212.) The Court heard oral argument on the motions on February 5, 2019. Having duly considered the parties' written and oral arguments, and the admissible evidence submitted, and for the reasons set forth herein, the Court **ORDERS** as follows: (1) the cross-motion of Motorists for summary judgment is **GRANTED**; and (2) the motion of Old Republic for summary judgment is **DENIED**. The Court finds that the undisputed material facts show that there was no potential for coverage under the Motorists policy at issue with respect to additional insureds Architectural Glass and Aluminum Co., Inc. ("AGA") and Webcor Construction,

LP dba Webcor Builders ("Webcor") for claims raised in the underlying litigation. Accordingly, a duty to defend did not attach.

**I.   SUMMARY OF FACTS[1]**

   **A.   The Underlying Action**

The instant third-party complaint stems from an underlying construction defect action filed in the Superior Court for the State of California, County of San Francisco captioned *CDC San Francisco LLC v. Webcor Builders. Inc. et al.*, Case No. CGC15-546222. The complaint in the underlying action alleged that plaintiff therein, CDC San Francisco LLC, entered into a construction agreement with Webcor, the general contractor, to build a project known as the Intercontinental Hotel. (Old Republic Request for Judicial Notice, Exh. A [Complaint in Case No. CGC15-546222, hereinafter "ORRJN Exh. A"].) The agreement, in part, called for Webcor to design and build an exterior curtainwall system that would serve as the exterior wall of the hotel. The exterior curtainwall system is "an interconnected system of azure-blue glass that forms the building's entire exterior such that the Hotel appears in the San Francisco skyline as a 32[-]story translucent blue tower of glass." (*Id.* ¶ 12.) AGA was the "curtainwall contractor" for the project, and was responsible for designing, engineering, testing, fabricating, delivering, and installing the curtainwall system. (Motorists Fact[2] 4.)

The underlying action, filed on June 9, 2015, alleged that the curtainwall glazing system was comprised of a structural frame into which insulated glass units (IGUs) were fastened. (ORRJN Exh. A ¶ 12.) The IGUs were comprised of two panes of glass, a spacer bar, structural silicone sealant to secure the panes of glass and metal spacer together, and polyisobutylene ("PIB") sealant to form a vapor barrier or hermetic seal around the interior perimeter of the module. (*Id.*; Motorist Fact 7.) AGA also subcontracted with Viracon, Inc. to manufacture the IGUs. (Motorist Fact 6.) AGA subcontracted with Midwest Curtainwalls, Inc. ("Midwest") to (1) design and manufacture the

---

[1] All facts are undisputed unless otherwise noted.

[2] References to the parties' "Facts" incorporate the evidence cited in their separate statements and responses thereto.

2

curtainwall frame; (2) glaze (or glue) the IGUs into the frame; and (3) ship the completed curtainwalls to San Francisco where AGA installed them at the project site. (Motorists Fact 9, 10.) The project included 6,400 IGUs. (Old Republic Fact 8.) The project was completed around February 27, 2008. (Old Republic Fact 9.)

In the underlying action, CDC San Francisco LLC alleged that migration or movement of the PIB sealant had caused a gray film or "mottling" in the interior space of the IGUs, as well as discoloration of the structural silicon to a brownish color on the visible edges of the IGUs. (Motorists Fact 12; ORRJN Exh. A ¶ 14.) The complaint therein alleged "there is no way to repair the PIB without damaging the [IGUs] and the exterior Curtain Wall glazing system to access the film formation." (ORRJN Exh. A at ¶ 14.) The complaint explained in considerable detail the defects with the curtain wall system and the warranties associated therewith. (*See id*. ¶¶ 14-25.) In addition to these factual allegations, the underlying complaint alleged potential damages based upon the "substantial costs to repair the deficient work" and the "costs to repair *property damaged by* deficient work . . . ." (*Id.* ¶¶ 29, 34, 41, 45, 51, 57, 61, 67, 72, 77, 81, 86, 90, and 95 (emphasis supplied).)

### B. The Policy

Subcontractor Midwest obtained a commercial general liability policy from third-party defendant Motorists, with an effective policy period of June 30, 2006 to June 30, 2007 (Motorists policy number 33.261515- 90E or "the Policy"). (Motorists Fact 19.) The Policy included as additional insureds both AGA and Webcor. (*Id*.) The additional insured endorsement of the Policy stated:

> A. Section II- Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for 'bodily injury,' 'property damage' or 'personal and advertising injury' caused, in whole or in part, by:
> 1. Your acts or omissions; or
> 2. The acts or omissions of those acting on your behalf;
> In the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.
>
> B. With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:
>
> This insurance does not apply to 'bodily injury' or 'property damage' occurring after:

3

> 1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
> 2. That portion of 'your work' out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

(Motorists Fact 21.) The Policy covered "property damage" defined as "physical injury to tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured." (Motorists Fact 22.)

Further, the Policy applied to property damage only if it "occur[ed] during the policy period." (Campo Decl., Exh. 3 at MM000226). Under the terms of the Policy, property damage "will be deemed to have been known to have occurred at the earliest time when any insured . . . (1) Reports all, or any part, of the . . . 'property damage' to [the insurer]; . . . (2) Receives a written or verbal demand or claim for damages because of the . . . 'property damage'; or (3) Becomes aware by any other means that . . . 'property damage' has occurred or has begun to occur." (*Id*.)

In pertinent part, the Policy specifically excluded from coverage:

**j. Damage to Property**

> 'Property damage' to . . . (5) [t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations, or (6) [t]hat particular part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it . . . [unless] included in the 'products-completed operations hazard.'[3]

**k. Damage to Your Product**

> 'Property damage' to 'your product' arising out of it or any part of it.

*l*. **Damage to Your Work**

> 'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.' This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

---

[3] At the hearing on this matter, the parties conceded that the Policy included an additional coverage limit for "Products-Completed Operations" (*See* Declaration of John R. Campo, Exh. 3, MM000216). However, Old Republic does not argue that the Products-Completed Operations coverage applied to AGA or Webcor as additional insureds.

> **m. Damage to Impaired Property Or Property Not Physically Injured**
> 'Property damage' to 'impaired property' or property that has not been physically injured, arising out of [¶ . . .] [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work' after it has been put to its intended use.

(*Id*. at MM000229-30, 240-41.) The Policy also defined certain terms relevant here, including:

> 8. 'Impaired property' means tangible property, other than 'your product' or 'your work,' that cannot be used or is less useful because:
>> a. It incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or
>> b. you have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:
>> a. the repair, replacement, adjustment or removal of 'your product' or 'your work'; or
>> b. Your fulfilling the terms of the contract or agreement.
>
> \* \* \*
>
> 21. 'Your product':
> a. Means:
>> (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>>> (a) You;
>>> (b) Others trading under your name; or
>>> (c) A person or organization whose business or assets you have acquired; and
>>
>> (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.
>
> b. Includes:
>> (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product'; and
>> (2) The providing of or failure to provide warnings or instructions . . . .
>
> 22. 'Your work':
> a. Means:
>> (1) Work or operations performed by you or on your behalf; and
>> (2) Materials, parts or equipment furnished in connection with such work or operations.
>
> b. Includes:
>> (1) Warranties or representations made at any time with respect to the fitness. quality, durability, performance or use of 'your work,' and
>> (2) The providing of or failure to provide warnings or instructions . . . .

(*Id*.) After the end of the effective period of the policy on June 30, 2007, Midwest was insured by Acuity Mutual Insurance Company through June 30, 2014. (Motorists Additional Fact 6.)

5

### C. Defense of the Underlying Action

Both AGA and Webcor tendered their defense to Motorists, and Motorists denied a duty to defend them. (Old Republic Facts 39-41 and 45-47.) Motorists provided a defense to Midwest under the Policy, though it did so under a reservation of rights. (Old Republic Facts 29-30.) Old Republic provided a defense for AGA and Webcor in the underlying action. The underlying action settled on April 24, 2017. (Old Republic Fact 28.)[4] Old Republic filed the instant third-party complaint against Motorists for contribution toward the costs of defense paid by Old Republic on behalf of Webcor and AGA on July 12, 2017. (Dkt. No. 69.)

## II. APPLICABLE STANDARDS

### A. Summary Judgment

The parties each have filed motions for summary judgment on the issue of whether Motorists had a duty to defend Webcor and AGA. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alteration and internal quotation marks omitted). Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id*. (quoting Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2720, at 335–36 (3d ed. 1998)). If, however, the cross-motions are before the court at the same time, the court must consider the evidence proffered by both sets of motions before ruling on either one. *Riverside Two*, 249 F.3d at 1135–36.

---

[4] Old Republic paid a total of $3,000,000 toward the settlement, the total amount of which is confidential. (Old Republic Fact 32, 34.) Motorists also paid money on behalf of Midwest to settle the underlying action. (Old Republic Fact 29.) Whether either insurer was reimbursed for the amounts paid into the settlement, and by whom, is not part of the record here nor is it relevant to the issues before the Court.

6

**B. Duty to Defend**

An "insurer has a duty to defend an insured if it becomes aware of, or if [a] third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 19 (1995), *as modified on denial of reh'g* (Oct. 26, 1995) (internal citations omitted). Under well-established California law, "the duty to defend is broader than the duty to indemnify." *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 299–300 (1993) (*Montrose I*); *see also Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal.4th 277, 287 (2014) (duty to defend interpreted broadly). "If any facts stated in or fairly inferable from the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises." *Albert v. Truck Ins. Exch.*, 23 Cal.App.5th 367, 377–78 (2018) *quoting McMillin Management Services, L.P. v. Financial Pacific Ins. Co.*, 17 Cal.App.5th 187, 191 (2017).

"Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." *Montrose I*, 59 Cal.4th at 287; *see also Hartford Casualty*, 59 Cal.4th at 287 (same). The insured need only show a mere possibility of coverage under the policy to establish a duty to defend, while an insurer is entitled to summary judgment only upon a showing that no potential for coverage exists under the policy as a matter of law. *Regional Steel Corp. v. Liberty Surplus Ins. Corp.*, 226 Cal.App.4th 1377, 1389 (2014); *see also County of San Diego v. Ace Property & Casualty Ins. Co.*, 37 Cal.4th 406, 414 (2005) ("*Ace Property*"); *Montrose I,* 6 Cal.4th at 300; *Gray v. Zurich Ins. Co.* 65 Cal.2d 263, 275 (1966). In other words, if the third-party complaint could not raise a single issue that would bring it within the policy's coverage under any conceivable theory, the insurer need not defend. *Gray*, 65 Cal.2d at 276, fn. 15; *see also Hyundai Motor Am. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 600 F.3d 1092, 1097 (9th Cir. 2010) (obligation to defend excused only when the complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage).

"The duty to defend is determined by reference to the policy, the complaint, and *all* facts known to the insurer from any source." *Montrose I*, 6 Cal.4th at 300 (emphasis in original). "The determination whether the insurer owes a duty to defend usually is made in the first instance by

7

comparing the allegations of the complaint with the terms of the policy." *Id*. "Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." *Id.* at 295, *quoting Gray*, 65 Cal.2d at 276. "An insurer that has issued an insurance policy that includes a duty to defend must defend any legal action brought against an insured that is based in whole or in part on any allegations that, if proved, would be covered by the policy, without regard to the merits of those allegations. RESTATEMENT OF THE LAW, LIABILITY INSURANCE § 13, *Conditions Under Which the Insurer Must Defend* (AM. LAW INST., Revised Proposed Final Draft No. 2, Sept. 7, 2018). "For the purpose of determining whether an insurer must defend, the legal action is deemed to be based on: (a) Any allegation contained in the complaint or comparable document stating the legal action; and (b) Any additional allegation known to the insurer, not contained in the complaint or comparable document stating the legal action, that a reasonable insurer would regard as an actual or potential basis for all or part of the action." *Id*.

"An insurer may rely on an exclusion to deny coverage only if it provides conclusive evidence demonstrating that the exclusion applies." *Atlantic Mut. Ins. Co. v. J. Lamb, Inc*., 100 Cal.App.4th 1017, 1038-1039 (2002). However, in determining whether a particular policy provides a potential for coverage, the Court is guided by the principle that interpretation of an insurance policy is a question of law. *Ace Property*, 37 Cal.4th at 414 (citing cases).

## III. DISCUSSION

Old Republic's third-party complaint alleges a single claim for contribution against Motorists. "In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal.App.4th 1279, 1293 (1998). "Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk." *Id*. The claim for contribution here turns entirely on whether Motorists had a duty to defend AGA and Webcor in the underlying litigation.

Old Republic contends that, at the time of tender, the facts known to Motorists regarding the underlying action established a potential for coverage based upon "property damage" resulting from Midwest's work during the period of the Policy. Thus, Old Republic argues, Motorists had a duty to defend AGA and Webcor as additional insureds of Midwest under the Policy's Additional Insured provisions, and now must contribute to the costs of the defense wrongly denied them. Motorists disagrees, contending for several reasons that no potential for coverage as to AGA and Webcor exists.

### A. "Property Damage" Alleged In the Underlying Action

Motorists argues first that the complaint in the underlying action, and the facts known to Motorists regarding those claims, demonstrate that the underlying litigation did not concern "property damage" as defined by the Policy. Motorists argues the only purported "property damage" was Midwest's defective work itself, not damage to other property. As such, Motorists contends, there was no "physical injury to tangible property" as defined by the Policy.

Under California law, "the prevailing view is that the incorporation of a defective component or product into a larger structure does not constitute property damage unless and until the defective component causes physical injury to tangible property in at least *some other part of the system*." *F & H Constr. v. ITT Hartford Ins. Co.*, 118 Cal.App.4th 364, 372 (2004) (emphasis supplied). "California cases consistently hold that coverage does not exist where the only property 'damage' is the defective construction, and damage to *other* property has not occurred." *Regional Steel Corp. v. Liberty Surplus Ins. Corp.,* 226 Cal.App.4th 1377, 1393 (2014) (emphasis in original). "[P]roperty damage is not established by the mere failure of a defective product to perform as intended . . . [n]or is it established by economic losses such as the diminution in value of the structure or the cost to repair a defective product or structure." *F & H Constr.*, 118 Cal.App.4th at 372 (internal citations omitted).

This understanding of the meaning of "property damage" arises from the principle that general liability policies, such as the Commercial General Liability ("CGL") policy here, "are not designed to provide contractors and developers with coverage against claims their work is inferior or defective . . . [since t]he risk of replacing and repairing defective materials or poor workmanship has

9

generally been considered a commercial risk which is not passed on to the liability insurer." *Maryland Cas. Co. v. Reeder*, 221 Cal.App.3d 961, 967 (1990), *modified* (July 25, 1990). "Rather liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products." *Id.*; *see also F & H Constr.*, 118 Cal.App.4th at 372–73. Defective materials and construction do not themselves constitute "property damage." *Reeder*, 221 Cal.App.3d at 969. In other words, "a liability insurance policy is not designed to serve as a performance bond or warranty of a contractor's product." *F & H Constr.*, 118 Cal.App.4th at 373 (internal citations omitted). In the absence of allegations or extrinsic facts suggesting that the defective work or materials caused damage to *other property*, or physically harmed the whole of the structure, such as by introducing a hazardous contaminant, no potential for coverage exists. *Regional Steel*, 226 Cal.App.4th at 1392 (citing *Armstrong World Industr. Inc. v. Aetna Casualty & Surety Co*, 45 Cal.App.4th 1 (1996) and *Shade Foods, Inc. v. Innovative Products Sales & Mktg.*, 78 Cal.App.4th 847 (2000)).

The court in *Regional Steel* summarized the two lines of cases interpreting "property damage." *Regional Steel*, 226 Cal.App.4th at 1391-93. The first arising from poor workmanship and the second from contamination. *Regional Steel* arose from the former. There, the court determined that no coverage existed for a claim arising from work on an apartment project in which the insured installed the wrong type of tie hooks as part of its installation of the steel framing. *Regional Steel*, 226 Cal.App.4th at 1381-82. Regional was the subcontractor hired to design and construct the steel frame, including the seismic tie hooks. A separate subcontractor was engaged to supply and pour concrete to encase the steel frame. When a safety inspection found that the wrong seismic tie hooks were used, the construction was delayed and repairs undertaken, necessitating the "reopening" of the concrete encasing the steel frame. *Id.* at 1383-84. The court in *Regional Steel* held that the insurer had no duty to defend because the allegations of the underlying action did not constitute "property damage" but merely defective workmanship of the steel framing system. *Id.* at 1393. "The only allegations [the owner] made against Regional were that it failed to install the proper tie hooks, and its failure to do so necessitated demolition and repair of the affected areas—allegations squarely within the ambit of the rule . . . that this type of repair work is not covered under a CGL Policy." *Id.*

Other decisions interpreting California law are in accord, holding that defective products or workmanship, even when they require repairs that affect other physical structures, do not constitute "property damage" under a CGL policy. *See F&H Construction*, 118 Cal.App.4th 364, 373-74 (defective pile caps installed at a project, which did not otherwise damage any other portions of the project did not constitute "property damage" under CGL policy); *American Home Assurance Co. v. SMG Stone Company. Inc.*, 119 F.Supp.3d 1053, 1060-61 (N.D. Cal. 2015) (under California law, defective installation of floor tiles which cracked do not constitute 'property damage' for purposes of CGL policy because the defective installation did not cause damage to other parts of the project); *see also New Hampshire Ins. Co. v. Vieira*, 930 F.2d 696, 697 (9th Cir. 1991) (denying insurer's claim for reimbursement based on subcontractor's failure to nail drywall properly to interior walls and install in attics as not constituting "property damage" under CGL policy despite repairs requiring holes to be cut in roof); *see also* 9A COUCH ON INSURANCE 3d ed.§ 129:7 ("The mere failure of a defective product to perform as intended also does not give rise to property damage. Likewise, the costs incurred to repair a defective product or defective work do not constitute property damage under a commercial general liability policy.")

Here, the undisputed evidence shows that the claims of the underlying action, and the facts known to Motorists regarding that action, concerned only defects in the curtainwall system supplied by Midwest. The purchase order between Midwest and AGA required Midwest to "furnish [a] complete factory[-]assembled and glazed curtain wall system . . . [including] all design, engineering calculations, system drawings, embed layout drawings and necessary coordination for all details." (Midwest Exh. 2, Dkt. No. 212-9, at ECF p. 92.) Per the agreement, Midwest was "completely responsible for system design" and "responsible to coordinate all necessary sealant compatibility testing." (*Id.*)[5] The damage in the underlying action was limited to the curtainwall system itself. (Old Republic Facts 2, 3, 12, 13, 14, and response thereto.)

---

[5] The agreement between AGA and Midwest called for Midwest to provide insurance certificates with AGA listed as an additional insured. (Midwest Exh. 2 at ECF pg. 92.) It further required that the insurance include "completed operations coverage broad form contractual liability coverage, and broad-term property damage coverage." (*Id*. at ECF p. 100, ¶ 20.) Apparently, Midwest did not obtain that coverage. However, there is no claim here that Old Republic should be able to recover from Motorists because Midwest failed to obtain the level of coverage required by the

11

Old Republic focuses on the second line of cases and argues that the potential for "property damage" under the terms of the Policy existed because the IGUs themselves were damaged due to Midwest's faulty workmanship. More specifically, Old Republic argues that gluing the IGUs into the curtainwall frame irreversibly damaged them, resulting in property damage under the Policy. The IGUs were manufactured by Viracon and purchased by AGA for inclusion in the curtainwall system. Thus, Old Republic contends the IGUs constitute AGA's "property" damaged by Midwest's work, rather than an integral part of Midwest's "work" or "product" itself.

For its proposition, Old Republic relies on *Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal.App.4th 847, 861 (2000), *as modified on denial of reh'g* (Mar. 29, 2000). *Shade Foods* does not persuade. That case concerned contamination of a food product by incorporation of one component, namely "defective almonds" or said differently, almonds pieces which included wood splinters that were "sharply pointed and one-fourth inch to two or three inches long." *Id*. at 861. The appellate court affirmed a finding of coverage under a general liability policy, holding that "where a potentially injurious material in a product causes loss to other products with which it is incorporated," that loss is property damage under a general liability policy. *Id.* at 865. The court analogized the defective, splinter-ridden almonds to asbestos-containing building materials, the presence of which "causes injury to a building because the potentially hazardous material is physically touching and linked with the building." *Id*. at 866 (internal citation omitted). The court in *Shade Foods* held that incorporation of a defective product causing such contamination qualifies as property damage under the terms of a standard CGL policy. *Id.* at 865.

The *Shade Foods* court distinguished the circumstances there and in similar contamination cases from those cases holding that "diminution in the value of a product by reason of a defective part or faulty workmanship does not constitute property damage." *Id*. at 865; *see also Seagate Tech., Inc. v. St. Paul Fire & Marine Ins. Co.*, 11 F. Supp. 2d 1150, 1155 (N.D. Cal. 1998) (distinguishing asbestos contamination liability in *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal.App.4th 1 (1996) from defective design or manufacture of a component product which

---

agreement. Moreover, it does not appear such a claim would be viable. *Patent Scaffolding Co. v. William Simpson Const. Co.*, 256 Cal. App. 2d 506, 511-12 (1967) (insurer cannot recover for loss caused by contractor's failure to obtain insurance that would have spread risk to another insurer).

12

constitutes a commercial risk not passed on to a liability insurer); *New Hampshire Ins. Co. v. Vieira*, 930 F.2d 696, 701 (9th Cir. 1991) (defective workmanship does not constitute "property damage" and the nature of repairs required to fix those defects "cannot convert noncovered damage into covered damage"). Moreover, *Shade Foods* did not establish an insured's liability to the other suppliers for "damage" to their non-hazardous components simply because of combination to form the insured's product. *Shade Foods* does not support the argument that one component of an integrated whole can be found to have caused property damage to the other components with which it was combined. Old Republic does not contend that curtainwall system "contaminated" any other property outside the system itself, making *Shade Foods* inapposite. Thus, Old Republic has offered no persuasive authority to support its theory that "damage" to a *component* of an integrated final product can constitute distinct "property damage" covered by a CGL policy like the one here.[6]

*Pulte Home*, also relied upon by Old Republic, is likewise distinguishable and offers no support for its arguments. *Pulte Home Corp. v. Am. Safety Indem. Co.*, 14 Cal.App.5th 1086, 1118 (2017), *reh'g denied* (Sept. 20, 2017), *review denied* (Nov. 15, 2017). In *Pulte Home*, the construction defect complaints identified both defective materials and workmanship, as well as overlapping forms of damage arising from concrete, electrical, and other work, all of which allegedly had permitted moisture damage to occur over time. *Id*. At the time of tender, "there was no reliable way shown for determining . . . which subcontractors' work had been substandard or whether it had damaged its own or another's adjacent work." *Id.* Here, the underlying action offers no factual allegations of damage other than to the curtainwall system itself.

The Court notes that Old Republic has not argued that any other property was damaged aside from the IGUs. However, the Court is mindful that the underlying complaint alleged claims against AGA, Webcor, and Midwest for "substantial additional costs to repair the deficient work, [and] *costs to repair property damaged by deficient work*." (*See* Old Republic RJN, Exh. A, CDC San Francisco

---

[6] Old Republic also argued strenuously that Motorists' defense of Midwest demonstrates that Motorists must have recognized a potential for coverage of the additional insureds. However, that tactical position, taken under a reservation of rights to dispute coverage, is wholly irrelevant to the question of whether the underlying action and the facts known to Motorists gave rise to a potential of a covered claim by AGA or Webcor. Further, the coverages provided to those insureds differed from those applicable to the additional insureds. (Motorists Fact 21.)

13

complaint, at ¶¶ 29, 34, 41, 45, 51, 57, 61, 67, 72, 77, 81, 86, 90, and 95, emphasis supplied.) Old Republic has not argued such allegations, without other factual allegations to support them, would give rise to a duty to defend without more. The Court agrees with that tacit admission. The underlying complaint did not include factual allegations of damage to property other than the curtainwall system itself. It is the *factual* allegations of the underlying complaint, and not boilerplate allegations of "costs to repair property damaged by deficient work" that are the basis for the Court's analysis. *See Advent, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 6 Cal.App.5th 443, 460 (2016) (speculation about facts that "might naturally be supposed to exist along with the known facts" insufficient to create a duty to defend); *Albert v. Mid-Century Ins. Co.*, 236 Cal.App.4th 1281, 1290 (2015) ("the proper focus is on the facts alleged in the complaint, rather than the alleged theories for recovery . . . the insured 'may not speculate about unpled third party claims to manufacture coverage'"); *Friedman Prof. Mgmt. Co. v. Norcal Mut. Ins. Co.*, 120 Cal.App.4th 17, 34–35 (2004) ("An insured is not entitled to a defense just because one can imagine some additional facts which would create the potential for coverage"); *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal.App.4th 1, 110 (1996) ("as a general rule[,] conclusory allegations are not enough to give rise to a duty to defend").

In sum, there is no disputed issue of material fact that the matters alleged in the underlying action or otherwise known to Motorists created a potential for property damage covered by the Policy. Accordingly, Motorists is entitled to summary judgment that it had no duty to defend.

**B.     Exclusions from Coverage Under the Policy**

Even if the Court were to consider damage to the IGUs to be "property damage" under the terms of the Policy, the exclusions in the Policy would have eliminated any potential for coverage based upon Midwest's defective construction of the curtainwall system. To demonstrate that an exclusion eliminates the duty to defend, the insurer must provide "conclusive evidence [proving] that the exclusion applies in all possible worlds." *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1039 (2002). Here, Motorists contends multiple exclusions in the Policy excluded coverage for the property damage alleged in the underlying complaint and known to Motorists at the time of tender.

First, the policy exclusions in paragraph (k) and (*l*) preclude coverage for damage to, and arising out of, the insured's "product" and the insured's "work." (Campos Decl. Exh. 2 at MM000230-31.) The Policy defined the insured's "work" as "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations." (*Id*. at MM000240-41.) It defines the insured's "product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the insured including "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of" the product. Here, Midwest manufactured a curtainwall system, using parts it manufactured itself as well as parts supplied by others. The complaint in the underlying action alleged damage arising from Midwest's "work" or "product." California courts have interpreted nearly identical exclusions to "preclud[e] coverage for liability for damage to and deficiencies of the insured contractor's work product [and] applies to the insured's defective work as well as to the insured's satisfactory work that is damaged by the insured's defective work." *Diamond Heights Homeowners Assn. v. Nat'l Am. Ins. Co.*, 227 Cal.App.3d 563, 571 (1991). Like the "property damage" definition itself, "[t]he exclusion is consistent with the purpose of [a CGL] type of policy which is neither a performance bond nor an all-risk policy." *Id*.

Second, the Policy's exclusions at paragraphs (j)(5) and (6) deny coverage for property damage to "real property" that "arises out of" the insured's operations, and damage to *any* property "that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it . . . [unless] included in the 'products-completed operations hazard.'" (Campos Decl. Exh. 2 at MM000229-30.)[7] The Policy defined "your work" as "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations." (*Id*. at MM000240-41.) Interpreting similar faulty workmanship exclusions, California courts have held that such provisions preclude coverage for deficiencies in the insured's work. *See, e.g., Clarendon Am. Ins. Co. v. Gen. Sec. Indem. Co. of Arizona*, 193 Cal.App.4th 1311, 1325 (2011)

---

[7] As noted in note 3, *supra*, the parties conceded that the Policy included an additional coverage limit for "Products-Completed Operations." (*See* Declaration of John R. Campo, Exh. 3, MM000216.) However, Old Republic does not argue that the Products-Completed Operations coverage applied to additional insureds AGA or Webcor.

15

(citing *Maryland Casualty, supra,* 221 Cal.App.3d at 967). In *Clarendon*, the court held that the identical exclusion applied where the underlying action did not "reference any damage to the work of others [but] simply list[ed] faulty work which must be repaired or replaced." *Clarendon*, 193 Cal.App.4th at 1326. In the absence of any evidence of damage to the work of *others* that might have been caused by the faulty work of the insured, the court found the exclusion precluded coverage. *Id*.

Examining the same exclusion as in the Policy here, the court in *Clarendon* held that "[t]he exclusion found in j(6) excludes coverage for the physical injury to, or loss of use of, that part of the property that must be replaced" because the insured's work was performed incorrectly. The exclusion therefore eliminates the potential for coverage of claims for alleged defects and deficiencies 'resulting from poor workmanship and/or materials.'" *Id*. Moreover, the inference that other portions of the project here would be affected by repair or replacement of the curtainwall system does not create coverage where none existed. *See Regional Steel Corp.*, 226 Cal.App.4th at 1394 ("The only allegations JSM made against Regional were that it failed to install the proper tie hooks, and its failure to do so necessitated demolition and repair of the affected areas—allegations squarely within the ambit of the rule . . . that this type of repair work is not covered under a CGL Policy"); *New Hampshire Ins. Co. v. Vieira*, 930 F.2d 696, 701-02 (9th Cir. 1991) (insured's defective installation of drywall in rooms and attics required remediation by cutting holes in roof to install additional drywall in attics, but remediation costs were not covered due to work product exclusions); *Golden Eagle Ins. Co. v. Travelers Companies,* 103 F.3d 750, 757 (9th Cir. 1996) (where a CGL policy excluded the cost of repairing the insured's own defective installation of concrete floors, the court concluded the cost of removing and replacing non-defective floor coverings was excluded from coverage); *see also Blanchard v. State Farm Fire & Cas. Co.*, 2 Cal.App.4th 345, 348–49 (1991) (under similar exclusion, where "faulty workmanship in the framing or drywall led to rainwater leaking in and damaging a homeowner's furnishings, [insured] would be indemnified for the damage to the furnishings, but not for the cost of repairing or replacing the faulty workmanship.")

Here, the undisputed facts evidence that the underlying litigation arose from claims that the sealant in the IGUs was breaking down and the components of the curtainwall system were comprised of incompatible materials, leading to discoloration to and possible breakdown of the sealant. (Old Republic Facts 2 and 3.) The project owner only sought repair, namely by removing and replacing the curtainwall system. (Motorists Fact 17.)[8] Old Republic has offered no evidence that the litigation raised the specter of damage other than to the curtainwall system. Indeed, the only evidence cited by Old Republic in support of its own motion concerned damage to the curtainwall system itself. (Old Republic Facts 5-24.) As in *Clarendon*, Old Republic's failure to "cite to any specific examples of damage to the work of others that might have been caused by [Midwest's] allegedly faulty work" fails to create a triable issue of fact. *Clarendon,* 193 Cal.App.4th at 1326.

Finally, the Policy also excluded, under paragraph (m), coverage for property damage "to 'impaired property' or property that has not been physically injured, arising out of [¶ . . .] [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'. . . ." (*Id.* at MM000229-30.) "Impaired property" includes property "that cannot be used or is less useful because . . . [i]t incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous" and can be restored to use by repairing or replacing that work or product. (*Id.* at MM000240-41.) It defined "your product" as "goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the insured. (*Id.*) The California Court of Appeal in *Regional Steel* held that a nearly identical "impaired property" exclusion barred coverage because the underlying action alleged "arose from deficiencies in [the insured's] performance of its work or from [its] failure to perform a contract in accordance with its terms, or both." *Regional Steel*, 226 Cal.App.4th at 1394. "The only allegations [the owner] made against Regional were that it failed to install the proper tie hooks, and its failure to do so necessitated

---

[8] The Court notes that Old Republic purported to dispute this fact in its responsive separate statement, but offered only argument that the repairs required cutting the damaged IGUs from the curtainwall system, including removing the gasket, setting block, and sealant components of the curtainwall system. (Old Republic Reply to Motorists Separate Statement, Fact 17.) Leaving aside that Old Republic cited no evidence to support this argument, those enumerated repairs are limited to the curtainwall system itself, which does not contradict Motorists' statement of fact.

17

demolition and repair of the affected areas—allegations squarely within the ambit of the rule . . . that this type of repair work is not covered under a CGL Policy." *Id.* at 1393.

In sum, the undisputed facts here establish that the Policy's exclusions would also preclude coverage for the damage in the underlying action. Consequently, Motorists had no duty to defend under the Policy.

## IV. CONCLUSION

Because Motorists has established by undisputed evidence that no potential for coverage of the damage in the underlying action existed, the Court finds as a matter of law that it had no duty to defend AGA and Webcor.[9]

Therefore, Motorists' motion for summary judgment is **GRANTED** and Old Republic's motion for summary judgment is **DENIED**.

Within five business days of this Order, Motorists shall submit a proposed form of judgment, approved as to form by Old Republic, which will be entered forthwith.

This terminates Docket Nos. 211 and 212.

**IT IS SO ORDERED**.

Dated: March 12, 2019

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[9] Motorists argues additional bases for finding it had no duty to defend, including the lack of an "occurrence" during the policy period and the additional insured endorsement specifically limiting coverage to "ongoing operations." (*See, e.g.*, Campos Decl. Exh. 3 at MM000220, excluding property damage occurring after "[a]ll work . . . to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed.") Motorists cites convincing authority for its position. *See Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 669–70 (1995) (trigger for coverage under a CGL policy established at the time the complaining third party was "actually damaged," not when the wrongful act was committed). However, the Court need not reach the merits of these additional arguments in light of the decision herein.